**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**LITTLE ROCK DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **ROGERS BANCSHARES, INC.,** | § | |
| | § | **CASE NO.** _____ |
| **DEBTOR.** | § | |

**MOTION FOR ENTRY OF (A) AN ORDER**
**(I) APPROVING BIDDING PROCEDURES, (II) SCHEDULING BIDDING DEADLINE,**
**AUCTION DATE, AND SALE HEARING DATE, AND (III) APPROVING THE**
**FORM AND NOTICE THEREOF; AND (B) AN ORDER AFTER THE SALE HEARING**
**(I) AUTHORIZING THE DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR,**
**(II) WAIVING THE 14-DAY STAY, AND (III) GRANTING RELATED RELIEF**

Rogers Bancshares, Inc. ("RBI" or the "Debtor"), the above-captioned debtor and debtor in possession, submits this motion seeking entry of (A) an order (I) approving bidding procedures, (II) scheduling bidding deadline, auction date, and sale hearing date, and (III) approving the form and notice thereof; and (B) an order after the sale hearing (I) authorizing the Debtor to sell certain assets free and clear, (II) waiving the 14-day stay, and (III) granting related relief (the "Motion").[1]  In support of this Motion, RBI respectfully represents as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stock Purchase Agreement, dated as of July 5, 2013 by and between the Debtor and the Stalking Horse Bidder, attached hereto as Exhibit "A."

2.      The statutory predicates for the relief requested herein are §§ 105(a), 363, and 365 of title 11 of the United State Code (the "Bankruptcy Code"), and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.      RELEVANT BACKGROUND

3.      RBI is a bank holding company under the Bank Holding Company Act of 1956, with its primary assets being shares in Metropolitan National Bank (the "Bank").[2]  The Bank was organized in 1970 to serve customers in Little Rock, Arkansas.  The Bank is now one of the largest banks headquartered in Arkansas and continues to have a strong brand name and distinguishable branch network.  The Bank has forty-five branches located in fifteen cities throughout central and northwest Arkansas and has the third largest branch network in northwest Arkansas.  Thirty-two of the Bank's branches are Bank-owned and twenty-four of the branches are less than six years old.  The Bank holds in excess of $888 million in total deposits and a top five market share in Pulaski County.  The Bank has 438 employees as of May 2013.

4.      The Bank has been serving the citizens of Arkansas for over 40 years.  Since the Bank's inception, the Board of Directors of the Bank has been steadfast in their commitment to provide products and services that meet the Arkansas communities' credit needs.  Consequently, the Bank has provided financing and financial products to thousands of small businesses and family enterprises that provide jobs and support to the economic community of Arkansas.  Throughout its history, the Bank has been committed to commercial development loans within the markets it serves.  This strategy served both the Bank and the communities it serves well until the late 2008 economic downturn.

---

[2] RBI also owns an operating account, three small bank accounts associated with the TruPS, notes receivable, and some fixed assets.  The operating account held approximately $60,000.00 on the Petition Date, which is unencumbered and will be used to fund this case.  The three bank accounts for the statutory trusts held a combined amount of approximately $273,318.86 on the Petition Date.  The remaining assets have a book value of approximately $333,318.86.

## A.  Capital Structure

5.      The Debtor owns 99.75% of the shares in the Bank.[3]  All of the shares are duly authorized and validly issued and have been issued in full compliance with all applicable securities laws and other applicable legal requirements.

6.      As of June 30, 2013, the Debtor had outstanding unsecured indebtedness and preferred stock obligations totaling approximately $80,758,124 in principal and $11,689,792 in interest and/or dividends accrued, consisting of: (a) $25.774 million of junior subordinated deferrable interest debentures issued to a statutory trust that in turn issued its capital securities designated as Trust Preferred Securities or "TruPS" to investors; (b) $5.155 million of junior subordinated deferrable interest debentures issued to a second statutory trust that in turn issued its TruPS to investors; (c) $10.310 million of junior subordinated deferrable interest debentures issued to a third statutory trust that in turn issued TruPS to investors; (d) $10 million of Noncumulative Perpetual Preferred Stock issued to Bear, Stearns & Co., Inc. as Initial Purchaser; (e) $3.250 million of Noncumulative Perpetual Series B Preferred Stock held by certain individual investors; (f) $25 million of fixed rate Cumulative Perpetual Preferred Stock, Series C issued to the United States Treasury Department (the "Treasury") pursuant to the Troubled Asset Relief Program ("TARP"); and (g) $1.25 million of fixed rate Cumulative Perpetual Preferred Stock, Series D issued to the Treasury pursuant to TARP.  The Debtor does not have any trade debt.

---

[3] The Directors and certain previous directors own the remaining .25% of the shares in the Bank, which are Director Qualifying Shares and were purchased in March 2010 for approximately $60,000.   These shares are "qualifying shares" to enable the individuals to serve as directors of the Bank.  They were purchased by six directors for $10,000 each, with the purchase price being financed by RBI, for which RBI holds six $10,000 notes payable by the respective directors.  Under the terms of the proposed transaction, immediately prior to closing RBI will contribute the notes to the Bank and the Bank will redeem all shares held by its directors in exchange for cancellation of the notes.

**B. Events Leading to the Chapter 11 Filing**

7.      Northwest Arkansas experienced significant economic growth in the 1990s through 2005, leading to an increase in the amount of bank branches and development in the area.  As a result, northwest Arkansas was overbanked and overdeveloped at the time of the late 2008 "credit crash" and ensuing economic downturn.  The credit and financial crisis had a significant effect on the Arkansas real estate market, borrowers, and consequently, the Bank.

8.      Before the late 2008 credit crash, the Bank made several strategic decisions that, while consistent with its prior successful business model, resulted in a difficult situation for the Bank after the late 2008 credit crash.  In particular, the Bank continued to expand with its commercial real estate ("CRE") growth model, which resulted in large concentrations in CRE lending, particularly in land development.  While this business model was successful for many years, a combination of circumstances exposed vulnerabilities that the Bank and the Debtor were not able to overcome.  The Bank embarked upon a branch expansion, opening 33 branches from 2004 through 2007, which significantly increased operating costs.  In 2008, the Arkansas real estate market, particularly in northwest Arkansas, where the Bank has a large concentration of loans, experienced a 40% decline in prices, the worst economic downturn in over seventy years.

9.      In May 2008, the Bank's concentration in CRE, land and development loans resulted in a low rating on the Office of the Comptroller of the Currency ("OCC") exam.  The OCC entered into a Formal Agreement with the Bank because of concerns regarding borrowers' ability to repay loans from the Bank and the strength of the collateral underlying these loans.  The Federal Reserve Bank of St. Louis ("FRB") followed with a Memorandum of Understanding for RBI in August 2008.  After the Bank entered into the Formal Agreement with the OCC, RBI pursued a variety of plans for obtaining the additional capital it needed.  In the fourth quarter of 2008, RBI applied for TARP.  The Treasury approved the TARP issuance in January 2009 and

RBI received the funds in February 2009 and contributed them to the Bank.  At the time the Bank received the capital related to the TARP funding, it believed its condition was sound.  RBI believed the TARP funding would provide the Bank with an additional cushion against the unknown and provide the Bank the opportunity to work with and support its customers during the economic downturn.  While, like many other financial institutions, the Bank had its share of borrowers negatively impacted by the economic crisis, the Bank responded by recognizing its losses and writing down asset values in a timely manner.

10.     Unfortunately, the extent of the economic crisis was yet to be fully realized and the road to economic recovery has proved much longer than anyone envisioned.  Even today, the recovery of the American economy remains fragile.  Due to the rapid deterioration of the real estate market and prolonged economic crisis, the Bank suffered tremendous losses in 2009 and did not fare well under the OCC's follow-up exam.  As a result of the 2009 exam, supervision of the Bank under the Formal Agreement with the OCC was sent to Washington and RBI was placed under a written agreement in August 2009.

11.     In April 2009, the Bank hired a financial advisory firm to do an independent third party loan review and retrain staff.  In recognition of the deteriorating value of the collateral for its loan portfolio, the Bank recorded an $80 million loss in 2009.  In May 2009, RBI engaged Keefe, Bruyette & Woods ("KBW") to seek investors to recapitalize RBI and the Bank and assist potential investors in connection with their due diligence.  However the continuing deterioration of the Bank's collateral and the financial prospects of its borrowers prevented any investors from agreeing to invest in RBI.  From 2010 through 2012, RBI continued to meet approximately monthly with KBW and attempt to find an investor.  Despite these extensive efforts, RBI was not able to reach any definitive agreement to recapitalize RBI or the Bank.  RBI and KBW also

attempted to negotiate a debt restructuring with certain holders of the TruPS in order to help facilitate a capital investment deal; however, no agreement could be reached. Throughout this period, the Bank continued to receive low ratings on the OCC exams and RBI received low ratings from the FRB. In addition, there was a decrease in activities in the national financial market, further complicating RBI's efforts to find an investor.

12. In March 2012, the Bank entered into a Stipulation and Consent to the Issuance of a Consent Order with the OCC. In November 2012, the FRB provided a written letter to RBI finding the overall condition of the Bank and RBI poor and future viability questionable absent a significant capital injection. The November 2012 letter also required RBI to submit a written capital plan addressing, among other issues, its lack of capital.

13. Despite the regulators' patience thus far, RBI is in a difficult situation and is unable to comply with FRB's requests in the November 2012 letter. From 2009, the Bank began to accumulate real estate owned ("OREO") from defaulting borrowers, voluntarily and by foreclosure, including large holdings of CRE and raw land in northwest Arkansas. Because of market conditions, the Bank has been unable to sell off a substantial portion of the OREO. As of July, the Bank has over $100 million in nonperforming loans and OREO and is not in compliance with the Consent Order's leverage ratio or risk-based capital requirements. The Debtor is currently deferring interest and preferred coupon payments on the TruPS debentures and TARP, and other preferred stock, and in February 2014, the annual TARP preferred dividend rate will increase to 9%. Until recently, the Debtor has been unable to identify new capital sources for the Bank, despite its robust marketing efforts through KBW.

14. After four years of such efforts, the Debtor had contacted approximately thirty-five different potential investors. The Debtor finally received a workable cash offer from LR

Acquisition Company, LLC, an affiliate of a nationally recognized private equity firm specializing in financial services companies (the "Stalking Horse Bidder"). The Stalking Horse Bidder offered to purchase the Shares and Other Purchased Assets through a § 363 sale. If effectuated, the Sale will recapitalize the Bank, ensure the Bank's regulatory compliance and ongoing viability, maximize the value available for the Debtor's creditors, save banking regulators millions of dollars, while making an investment in the community and allowing the Bank to continue serving the needs of individuals and businesses in central and northwest Arkansas.

15.     Absent approval of a sale of the Shares to an entity capable of recapitalizing the Bank, or an alternative equity infusion, the likelihood of which appears remote, the Bank may not be capable of surviving long term. If the Bank does not survive, virtually all value of RBI's ownership of the Shares will be lost and the creditors of RBI will receive little or nothing on their claims.

### C. Key Terms of the SPA

16.     The Stalking Horse Bidder and Debtor have agreed to the key terms of the proposed Sale and have executed a stock purchase agreement (the "SPA"), which remains subject to the Bankruptcy Court's approval. A copy of the SPA is attached hereto as Exhibit A. Pursuant to the SPA, the Debtor will sell the Shares in the Bank and other specified assets held by the Debtor ("Other Purchased Assets") to the Stalking Horse Bidder free and clear of all encumbrances in exchange for $16 million in cash (the "Purchase Price"). The Stalking Horse Bidder is also obligated to contribute equity to the Bank post-closing in an amount sufficient to achieve the capital levels required by the OCC (the "Capital Contribution"). The transaction is subject to approval of applicable bank regulators. The Sale is also subject to a marketing period and the receipt of higher and better offers. In addition, the Stalking Horse Bidder seeks certain

protections in the Bidding Procedures and Auction (as defined below) in the event of a third party topping bid or termination.

### III.  RELIEF REQUESTED

17.  By this Motion, the Debtor seeks entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit B, which (i) approves the Bidding Procedures (as defined in the SPA); (ii) approves certain bidding protections, including the Stalking Horse Bidder Fee (as defined in the SPA), the Minimum Overbid (as defined below), and the bidding increments described below; (iii) approves the form and manner of the Notice of Sale and Assignment Notice; and (iv) grants related relief.

18.  Further, the Debtor requests that within ten (10) days of the Bid Deadline and within sixty (60) days of the Petition Date, the Court schedule a Sale Hearing.  At the Sale Hearing, Debtor requests entry of the Sale Order, substantially in the form requested by the SPA, which (i) approves the SPA; (ii) confirms the sale of the Shares and Other Purchased Assets shall be free and clear of all encumbrances; and (iii) waives the 14-day stay.

### IV.  BASIS FOR RELIEF

#### A. Bidding Procedures

19.  The Bidding Procedures are designed to maximize value for the Debtor's estate. The key terms of the proposed Bidding Procedures are as follows:[4]

> a.  Due Diligence:  Each bidder wishing to participate in the bidding process ("Potential Bidder") shall be deemed to acknowledge and represent that (i) it has had an opportunity to conduct any and all due diligence regarding the Debtor, the Bank, the Shares and Other Purchased Assets prior to making any bids; (ii) it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Debtor and/or

---

[4] The proposed Bidding Procedures are attached hereto as Exhibit C.  In the event of any conflict between the Bidding Procedures and this summary, the Bidding Procedures shall control.  Capitalized terms used in this summary have the meaning ascribed to them in the Bidding Procedures.

the Bank and/or the Shares and/or the Other Purchased Assets in making its bid; and (iii) it did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor, the Bank, the Shares and Other Purchased Assets, or the completeness of any information provided in connection therewith, except as expressly stated in the Bidding Procedures or, as to the Successful Bidder, the agreement entered into by such Successful Bidder with the Debtor providing for the Successful Bid.

b.  Participation Requirements:   Any Potential Bidder that wishes to participate in the bidding shall deliver the following materials ("Participation Materials") to (i) counsel to the Debtor, Bracewell & Giuliani LLP, 1445 Ross Ave., Suite 3800, Dallas, TX 75202 (Attn: Sam Stricklin, email: Sam.Stricklin@bgllp.com) and Williams & Anderson PLC, 111 Center Street, 22nd Floor, Little Rock, AR 72201 (Attn: W. Jackson Williams, email: jwilliams@williamsanderson.com) and (ii) counsel to the Stalking Horse Bidder, Wachtell, Lipton, Rosen & Katz, 51 W. 52nd Street, New York, NY 10019 (Attn: Lawrence S. Makow, email: lsmakow@wlrk.com) no later than five (5) business days prior to the Bid Deadline (as defined below):

  i.   An executed confidentiality agreement that shall inure to the benefit of the Debtor and the Successful Bidder (as defined below) in form and substance reasonably acceptable to the Debtor and the Stalking Horse Bidder;

  ii.  A statement (1) identifying the Potential Bidder and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction and (2) demonstrating to the Debtor's satisfaction the Potential Bidder's *bona fide* interest in purchasing the Shares; and

  iii. Current audited financial statements and the latest unaudited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Shares and Other Purchased Assets, current audited financial statements and the latest unaudited financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure as the Debtor may require.

Based on the Participation Materials received by it and subject to the conditions that (1) no Potential Bidder shall consult with any other Potential Bidder following delivery of the Participation Materials and prior to the conclusion of the Auction, or submit at any time a joint bid

-9-

with any other Potential Bidder, without the express written consent of the Debtor and (2) by delivering Participation Materials, each Potential Bidder agrees that its identity and interest in the Sale may be made public, including in filings with the Bankruptcy Court, the Debtor shall determine whether any Potential Bidder that has timely submitted Participation Materials qualifies to submit an Initial Overbid (each such qualifying Potential Bidder, an "Allowed Bidder"). Only Allowed Bidders may bid for the Shares and Other Purchased Assets at the Auction. The Stalking Horse Bidder shall automatically, without the need to comply with the foregoing requirements, be deemed an Allowed Bidder.

c. Bid Requirements: To participate at the Auction, an Allowed Bidder must submit an "Initial Overbid," which must be received by a date no later than the Bid Deadline (as defined below), and shall contain, among other things, the following:

i. A proposed transaction agreement executed by the Allowed Bidder in the form of a purchase or other agreement (the "Competing Agreement") together with a redlined, marked copy showing all changes between the Competing Agreement and the SPA, which provides for a cash purchase price that exceeds the Purchase Price by at least the sum of the Stalking Horse Bidder Fee[5] and $1,000,000 (such aggregate amount of the Purchase Price, the Stalking Horse Bidder Fee and such increment, the "Minimum Overbid"), provides for the recapitalization of the Bank through a common equity investment of not less than the Capital Contribution in cash and otherwise on terms not less favorable to the Debtor and Bank, and, in any event, on terms acceptable to Governmental Authorities, and does not contain any consideration in the form of credit bidding;

ii. Confirmation that the Allowed Bidder's offer will remain irrevocable until (1) if the Allowed Bidder is the Back-up Bidder (as defined below), the earlier of the closing of a purchase of the Shares and Other Purchased Assets by the Successful Bidder or twenty (20) days after entry of the Sale Order or (2) otherwise, entry of the Sale Order (in each case, irrespective of whether the Allowed Bidder submits a qualifying Initial Overbid or attends the Auction);

iii. Disclaimer of any right of the Allowed Bidder to receive any fee analogous to the Stalking Horse Bidder Fee, any transaction or break-up fee, expense reimbursement or similar fee or payment, or to compensation under the Bankruptcy Code Section 503(b) for making a substantial contribution;

---

[5] Pursuant to the terms of the SPA, the Stalking Horse Bidder Fee is $4,000,000.

iv. A proposed closing date that is not later than the earlier of one-hundred-and-twenty (120) days after the date of the SPA or five (5) days after the Allowed Bidder receives regulatory approval for the proposed transaction (the "Allowed Bidder Outside Date");

v. A cashier's check made payable to the order of Rogers Bancshares, Inc. in the amount of $5,000,000 (the "Allowed Bidder's Deposit"), which, (1) if the Allowed Bidder is the Successful Bidder will be retained by the Debtor as a nonrefundable good faith deposit for application against the purchase price at the closing of the Sale, (2) if the Allowed Bidder is the Back-up Bidder, will be returned to the bidder by the earlier of the closing of the Sale to the Successful Bidder or twenty (20) days after entry of the Sale Order, or (3) if the Allowed Bidder is neither the Successful Bidder nor the Back-up Bidder, will be returned to the bidder within three (3) business days after the Auction concludes, or, if no Auction is held, within three (3) business days after the Sale Hearing.  The Allowed Bidder's Deposit provided by each Allowed Bidder shall not earn interest;

vi. Evidence that the Allowed Bidder has the financial ability to pay the purchase price and effectuate the recapitalization of the Bank (through a common equity investment in cash) set forth in the Competing Agreement;

vii. Evidence that the Allowed Bidder is capable, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement, and qualified to do so, which such evidence shall include, but not be limited to, (1) written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as a Successful Bidder and such other evidence of ability to consummate the sale transaction as the Debtor may request and (2) a copy of a board resolution or similar document demonstrating the authority of the Allowed Bidder to make a binding and irrevocable bid on the terms proposed;

viii. Terms and conditions that are, in the aggregate, higher and better than the terms and conditions of the SPA as determined by the Debtor; provided, however, that if such terms and conditions include regulatory contingencies, such contingencies shall not disqualify a Competing Agreement but shall be taken into consideration when such Competing Agreement is evaluated; provided further, however, that such terms and conditions cannot include contingencies relating to due diligence, financing, bid

-11-

protections, expense reimbursement, or corporate consent or approval;

ix. Evidence in a form satisfactory to the Debtor establishing the Allowed Bidder's good faith within the meaning of § 363(m) of the Bankruptcy Code;

x. Sufficient information to establish that the Allowed Bidder is capable of obtaining all regulatory approvals required to perform all of its obligations under the Competing Agreement and to close the transactions contemplated thereby not later than the Allowed Bidder Outside Date.

An Initial Overbid shall be considered a "Qualified Bid" if, in the good faith opinion of the Debtor, after consulting with the Debtor's investment bankers, financial and legal advisors, (1) such bid is determined to not be materially more burdensome or conditional than the terms of the Purchase Agreement and (2) the Debtor reasonably believes that such bid would be consummated before the Allowed Bidder Outside Date if selected as a Successful Bid (as defined below).

d. Bid Deadline:  An Allowed Bidder that desires to make a bid shall deliver a written and electronic copy of its bid to (i) counsel to the Debtor, Bracewell & Giuliani LLP, 1445 Ross Ave., Suite 3800, Dallas, TX 75202 (Attn: Sam Stricklin, email: Sam.Stricklin@bgllp.com) and Williams & Anderson PLC, 111 Center Street, 22nd Floor, Little Rock, AR 72201 (Attn: W. Jackson Williams, email: jwilliams@williamsanderson.com); (ii) counsel to the official committee of unsecured creditors, if such committee is formed; (iii) and counsel to the Stalking Horse Bidder, Wachtell, Lipton, Rosen & Katz, 51 W. 52nd Street, New York, NY 10019 (Attn: Lawrence S. Makow, email: lsmakow@wlrk.com), on a date to be set in the Bidding Procedures Order (the "Bid Deadline").

e. Bidder Protections:  The Debtor has agreed to provide the Stalking Horse Bidder with certain bidder protections commonly approved in other bankruptcy sales to provide an incentive and compensate the Stalking Horse Bidder for serving as the stalking horse bidder.  In the event that the Stalking Horse Bidder is not the Successful Bidder for the Shares and Other Purchased Assets, the Stalking Horse Bidder shall be entitled to collect a $4,000,000 fee from the Debtor (the "Stalking Horse Bidder Fee"), which fee will be paid from the sale consideration or the Allowed Bidder's Deposit received from the Successful Bidder.

f. As Is, Where Is:  The Sale of the Shares and Other Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Debtor, its agents, advisors,

-12-

professionals, or estate, except to the extent set forth in the SPA or the Debtor's purchase agreement with the Successful Bidder.

g. No Initial Overbid:  If on the Bid Deadline, no conforming Initial Overbid is received, the Debtor shall not conduct an Auction and shall request at the Sale Hearing that the Bankruptcy Court approve the SPA, including the Sale of the Shares and Other Purchased Assets to the Stalking Horse Bidder (or its designee, as set forth in the SPA) and request that the Sale Order be immediately effective upon entry, notwithstanding the 14-day stay provisions of the Federal Rules of Bankruptcy Procedure and Rule 62(g) of the Federal Rules of Civil Procedure.

h. Auction Procedures: If on the Bid Deadline one (1) or more conforming Initial Overbids are received, the Debtor shall conduct an Auction, subject to Bankruptcy Court approval, of the Shares and Other Purchased Assets (the "Auction") in which the Stalking Horse Bidder and all other bidders that submitted conforming Initial Overbids (together with the Stalking Horse Bidder, the "Qualified Bidders") may participate.  The Auction shall be conducted at the offices of Williams & Anderson PLC, 111 Center Street, 22nd Floor, Little Rock, Arkansas 72201 at 9:00 a.m. (prevailing Central Time) or such other place and time as the Debtor may determine, so long as such change is communicated reasonably in advance to all Qualified Bidders and other invitees, if any.  The Auction will be governed by the following procedures:[6]

   i. Only the Debtor, members of any statutorily appointed committees, Qualified Bidders, and the representatives and advisors of the foregoing shall be permitted to attend the Auction;

   ii. The Auction shall be recorded by a stenographer employed by the Debtor;

   iii. The Auction shall be conducted by "open outcry" with all participants entitled to hear each bid;

   iv. Each bid by a Qualified Bidder, other than the Stalking Horse Bidder, shall be automatically reduced by an amount equal to the Stalking Horse Bidder Fee;

---

[6] In addition to the procedures outlined herein, the Debtor may employ and announce at the Auction other procedural rules that are reasonable under the circumstances for conducting the Auction; *provided, however*, that such rules are (i) not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court and (ii) disclosed to each Qualified Bidder at the Auction.  Notwithstanding the foregoing, the Bidding Procedures may be materially modified only upon the express written consent of the Debtor and the Stalking Horse Bidder or by order of the Bankruptcy Court.

v. Bidding will commence at the amount of the highest and best Qualified Bid submitted by a Qualified Bidder, as determined by the Debtor;

vi. The Debtor will evaluate each bid made at the Auction and will determine if such bid is higher and better than the prior bid made; such determination will be announced by the Debtor at the Auction and shall be final;

vii. No more than twenty (20) minutes shall be allowed for a Qualified Bidder to overbid the currently announced highest bid;

viii. No Qualified Bidder shall consult with any other Qualified Bidder prior to the conclusion of the Auction, or submit at any time a "joint bid" with any other Qualified Bidder, without the express written consent of the Debtor; however, the identity of each Qualified Bidder present at the Auction will be disclosed to each other Qualified Bidder;

ix. Each subsequent bid shall be in increments of no less than $500,000 (the "Bidding Increments") in excess of the prior highest and best bid;

x. Credit bidding shall not be permitted at the Auction;

xi. The Stalking Horse Bidder shall have the right, but not the obligation, in its sole and absolute discretion, to match bids made by any other Qualified Bidder and, in such event, the Stalking Horse Bidder's matching bid shall be deemed the highest and best bid for the Shares and Other Purchased Assets and to provide the greatest value to the Debtor, its estate and its stakeholders;

xii. Immediately before concluding the Auction, the Debtor shall: (1) review the final bid of each Qualified Bidder for its financial and contractual terms, including conditions to closing, expected timeline to closing, regulatory risk and such other factors relevant to the Sale process and the best interests of the Debtor's estate, its creditors, and other parties-in-interest therein as the Debtor may deem advisable; (2) determine and identify the highest or otherwise best Qualified Bid (the "Successful Bid") and the Qualified Bidder submitting such bid (the "Successful Bidder"); and (3) determine and identify the second highest or otherwise best Qualified Bid (the "Back-up Bid") and the Qualified Bidder submitting such bid (the "Back-up Bidder"); *provided*, in no circumstances shall the Stalking Horse Bidder be required to be a Back-up Bidder;

-14-

xiii.   Without limitation of the foregoing, the Debtor may deem a bid of a Qualified Bidder to be the Successful Bid or Back-up Bid, notwithstanding the receipt of a nominally higher bid from another Qualified Bidder, if the Debtor concludes that the nominally higher Qualified Bidder may not be able to close the Sale on a timely basis, because the purchase price includes non-cash consideration, or for any other reason;

xiv.   Within one (1) business day after the closing of the Auction, the Debtor shall file with the Bankruptcy Court and serve upon all Qualified Bidders and entities that have requested notice in the Bankruptcy Case a notice identifying the Successful Bidder;

xv.   The determination of the Successful Bid and the Back-up Bid by the Debtor at the conclusion of the Auction shall be final, subject to approval by the Bankruptcy Court.  If the Successful Bid is terminated or fails to close within the time period specified in the Successful Bid, the Debtor shall be authorized, but not required, to consummate the sale transaction with the Back-up Bidder.  The Back-up Bid shall remain open until the earlier of (1) the first (1st) business day following the consummation of the Sale to the Successful Bidder and (2) the twentieth (20th) day after entry of the Sale Order.  The Debtor shall be deemed to have accepted a Qualified Bid only when (1) such bid is declared the Successful Bid at the Auction; (2) definitive documentation has been executed in respect thereof; and (3) the Bankruptcy Court has entered an order approving such Successful Bid; *provided*, that under no circumstances shall the Debtor consider any bid made after the conclusion of the Auction.

**B.  Notice Procedures**

20.   The Debtor shall, within two (2) business days after the entry of the Bidding Procedures Order, serve a copy of the Motion, the Bidding Procedures Order, the proposed form of the Sale Order, and the Notice of Auction and Sale Hearing (the "Sale Notice"), substantially in the form attached hereto as Exhibit D, by first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"): (i) all entities known to have expressed an interest in a transaction with respect to the recapitalization of the Debtor (including, without limitation, a purchase of the Shares, the Other Purchased Assets, or a portion thereof), as evidenced by

executing a non-disclosure agreement ("NDA") with the Debtor or by participating in discussions with the Debtor or KBW after having executed a NDA; (ii) any entities known to have asserted any Encumbrances in or upon the Shares or Other Purchased Assets; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the FRB and the OCC; (iv) all parties to the SPA and all related agreements; (v) the Office of the United States Trustee; (vi) the Internal Revenue Service; (vii) the indenture trustees for the debentures held by Rogers Bancshares Statutory Trust I, Rogers Bancshares Statutory Trust II, and Rogers Capital Trust III; (vii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (ix) counsel to any official committee established in this Chapter 11 case, or if no such committee has been appointed, to the Debtor's twenty (20) largest unsecured creditors; and (x) the Treasury.

21.     The Debtor shall also cause a copy of the Sale Notice, substantially in the form attached hereto as Exhibit E, to be published in the national edition of *The Wall Street Journal* and *The Arkansas Democrat-Gazette* ("Publication Notice") within ten (10) days after the date the Bidding Procedures Order is entered, pursuant to Bankruptcy Rules 2002(d) and 2002(l).

## ARGUMENTS AND AUTHORITY

### A. The Sale Should be Approved Under Section 363(b) as Fair, Reasonable, and in the Best Interest of Creditors

22.     Pursuant to section 363(b), a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b).  Bankruptcy Courts may approve sales of assets outside the ordinary course of business where there is "some articulated business justification." *Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc, et al.* (*In re Continental Airlines, Inc.*), 780 F.2d 1223,

-16-

1226 (5th Cir. 1986); *Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re San Jacinto Glass Indus. Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988); *In re Condere Corp.*, 228 B.R. 615, 628-69 (Bankr. S.D. Miss. 1998); *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990). Bankruptcy courts have wide discretion with respect to approving sales of assets of a bankruptcy estate – they need "ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets." *In re Meill*, 441 B.R. 610, 615 (8th Cir. BAP 2010). A sale of property outside the ordinary course of business is in the best interest of the estate and may be approved if it is for a fair and reasonable price and in good faith. *Id*.

23.     The Debtor has sound business justification for the Sale of the Shares and Other Purchased Assets. The Bank is in significant need of recapitalization and currently has no source of additional funding. The Bank is not in compliance with the tier 1 leverage ratio or risk-based capital requirements under the Consent Order and is in a critically deficient condition with high levels of problem and nonperforming assets. The situation is only going to get worse as the Debtor continues to defer payments on its TruPS, debentures and TARP, and other preferred stock, and as the TARP preferred coupon rate increases to 9%. The Debtor has been marketing its assets and its shares in the Bank for four years, has contacted approximately thirty-five (35) potential investors, yet has been unable to find an investor willing to purchase the Shares and Other Purchased Assets with cash until now. Without a sale, the Bank will be unable to comply with the requirements of the Federal Reserve and OCC and will, in all likelihood, eventually be placed in receivership, eliminating any value to the Shares. There is sound business justification for the § 363 sale and it is the Bank's best chance at surviving.

-17-

**B. The Bidding Procedures are Fair, Designed to Maximize the Value Received for the Shares and Other Purchased Assets, and Provide Adequate and Reasonable Notice of the Sale.**

24.     The Bidding Procedures are intended to provide all interested parties with adequate and reasonable notice of the Sale pursuant to requirements of § 363.  Full disclosure of the terms of the Sale will be provided through the Sale Notice.  The Sale Notice is intended to provide timely and adequate notice to the Debtor's major creditor groups, parties interested in this bankruptcy case, parties that have previously shown an interest in the Shares and Other Purchased Assets, and parties potentially interested in bidding on the Shares and Other Purchased Assets.

25.     Further, the proposed Bidding Procedures are designed to maximize the value received for the Shares and Other Purchased Assets by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids, taking into account the nature of the Shares and Other Purchased Assets.  The Bidding Procedures also provide the Debtor with the opportunity to consider all competing offers and select the highest or best offer for the Sale based on the Debtor's sound business judgment.  An auction sale generally produces sufficient and fair value for the assets being sold.  *In re Trans World Airlines, Inc.*, 2001 WL 1820326, *4 (Bankr. D. Del. April 2, 2001).  Accordingly, the purchase price will be fair, reasonable, and in the best interest of the Debtor's estate and creditors.

**C. The Sale of the Shares and Other Purchased Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Bankruptcy Code Section 363(f).**

26.     A debtor is authorized to sell assets free and clear of liens, interests, and encumbrances if (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interests; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (d) such interest

is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f). The Debtor has satisfied at least one of the conditions under section 363(f); therefore, the Debtor requests that the Shares and Other Purchased Assets be transferred to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances.

**D. The Proposed Stalking Horse Bidder Fee is Necessary to Preserve the Value of the Debtor's Estate**

27.    A stalking horse bidder fee, or break-up fee, is intended to compensate an unsuccessful bidder for his "time, the risk that his offer is being used as a stalking horse to induce other bids, and the loss of other business and investment opportunities while the bidding process unfolds." *In re Diamonds Plus, Inc.*, 233 B.R. 829, 831 (Bankr. E.D. Ark. 1999). In determining whether a stalking horse bidder fee is appropriate, the court should consider nine factors: (a) whether the relationship of the parties who negotiated the fee is tainted by self-dealing or manipulation; (b) whether the fee hampers, rather than encourages bidding; (c) whether the amount of the fee is unreasonable relative to the proposed purchase price; (d) whether the unsuccessful bidder placed the estate property in a sales configuration mode to attract other bidders to the auction; (e) whether the request for a break-up fee served to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (f) whether the fee requested correlates with the maximization of value to the debtor's estate; (g) whether the principal secured creditors and the official unsecured creditors committee supports the concession; (h) whether there were safeguards beneficial to the debtor's estate; and (i) whether there would be a substantial adverse impact on unsecured creditors from approval of the break-up fee. *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 97-98 (8th Cir. 2003). Here, the Stalking Horse Bidder Fee meets substantially all of these factors.

28.     The Debtor and the Stalking Horse Bidder negotiated the Stalking Horse Bidder Fee at an arms' length and through negotiation.  The fee is intended to encourage bidding and attract additional bidders.  Due to the nature of the Shares and Other Purchased Assets, the Stalking Horse Bidder was required to undergo a more extensive due diligence process and seek regulatory approval.  By inducing the Stalking Horse Bidder to make an offer on the Debtor's assets, the Stalking Horse Bidder Fee will maximize the value of the Debtor's estate by enabling the Stalking Horse Bidder to conduct due diligence and determine the true value of the assets, upon which other potential bidders can rely.  Without a Stalking Horse Bidder Fee, the Stalking Horse Bidder would not have been willing to spend the substantial time and resources to complete the required due diligence and approvals relating to the Sale.  There are safeguards in place to ensure the Debtor receives the best and highest price for the Shares and Other Purchased Assets because the sale is taking place through a public Auction.  Similarly, the Stalking Horse Bidder Fee will not have an adverse impact on unsecured creditors; instead, the fee will be beneficial to the Debtor's creditors and the Debtor's estate by inducing a stalking horse bid and encouraging additional and higher bids at the Auction.

29.     Furthermore, the proposed Stalking Horse Bidder Fee is fair, reasonable, and within the range of similar protections approved in other financial services holding company cases where a bank has been sold.  *See*, *In re Premier Bank Holding Co.*, Case No. 12-40550 (Bankr. N.D. Fla. Sept. 13, 2012); *In re AmericanWest Bancorp.*, Case No. 10-06097 (Bankr. E.D. Wash. Nov. 3, 2010); *In re First Place Fin. Corp.*, Case No. 12-12961 (Bankr. D. Del. Nov. 28, 2012).  The total amount that the Stalking Horse Bidder is committed to fund under the SPA is comprised of the $16 million purchase price and an obligation to recapitalize the Bank with funds sufficient to cause the Bank to meet the regulatory targets imposed in the consent orders by

its regulators. The Stalking Horse Bidder requests a break-up fee of $4 million. The break-up fee is within the range of reasonableness given the proposed purchase price and anticipated size of the required capital injection that the Stalking Horse Bidder will make into the Bank to resolve its regulatory capital issues.

### E. The Court Should Waive the 14-Day Stay Period

30. The Debtor requests that, pursuant to Bankruptcy Rule 6004(h), the 14-day stay be waived under the circumstances of this bankruptcy case. It is in the interest of the Debtor's creditors and bankruptcy estate that the Sale be consummated as quickly as possible because of the risk of mass deposit withdrawals, the Regulator's response to such mass withdrawals, and the Bank's undercapitalized status. The Debtor has given sufficient notice of this Motion to all of the Debtor's creditors, interest holders, and parties in interest; therefore, there will be no prejudice as a result of the Court waiving the 14-day stay.

### V. NOTICE

31. Notice of this Motion has been provided to (i) all entities known to have expressed an interest in a transaction with respect to the recapitalization of the Debtor (including, without limitation, a purchase of the Shares, the Other Purchased Assets, or a portion thereof), as evidenced by executing a NDA with the Debtor or by participating in discussions with the Debtor or KBW after having executed a NDA; (ii) any entities known to have asserted any Encumbrance in or upon the Shares or Other Purchased Assets; (iii) all federal, state, and local regulatory or taxing authorities or recording officers which have a reasonably known interest in the relief requested by the Motion, including the FRB and the OCC; (iv) all parties to the SPA and all related agreements; (v) the Office of the United States Trustee; (vi) the Internal Revenue Service; (vii) the indenture trustees for the debentures held by Rogers Bancshares Statutory Trust

I, Rogers Bancshares Statutory Trust II, and Rogers Capital Trust III; (viii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (ix) the twenty (20) largest unsecured creditors of the Debtor; and (x) the Treasury.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

## VI.   NO PRIOR REQUEST

32.   No prior request for the relief sought in this Motion has been made to this or any other court.

## VII.   CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests the Court (i) issue the Bidding Procedures Order, substantially in the form attached hereto as Exhibit B, (ii) within ten (10) days of the Bid Deadline and within sixty (60) days of the Petition Date, schedule a Sale Hearing, and (iii) grant such other and further relief as the Court deems just.

DATE:  July 5, 2013

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: */s/ Samuel M. Stricklin*
Samuel M. Stricklin
Texas State Bar No. 19397050*
Lauren C. Kessler
Texas State Bar No. 24074528
(*Pro hac vice* admission requested)
1445 Ross Avenue Suite 3800
Dallas, TX 75202-2711
Telephone: (214) 468-3800
Facsimile: (214) 468-3888

*admitted to the Eastern & Western Districts of Arkansas, January 22, 1991

-   and      -

WILLIAMS & ANDERSON, PLC

-22-

W. Jackson Williams
Arkansas State Bar No. 59021
111 Center Street
Little Rock, AR 72201
Telephone: (501) 372-0800
Facsimile: (501) 372-6453

**PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION**

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 5, 2013, a true and correct copy of this document was served on all parties on the attached master service list by electronic means as listed on the court's ECF noticing system and/or by United States first class mail, postage prepaid.

/s/ Samuel M. Stricklin
Samuel M. Stricklin

#4321350.1

-23-